[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On August 11, 1991 David A. Aureli was killed in a head-on automobile collision while driving east on interstate 84 near Waterbury, Connecticut. His vehicle was struck by another vehicle heading west in the wrong direction on the highway. On that same date an autopsy was performed on David Aureli by Dr. H. Wayne Carver, the Chief Medical Examiner for the State of Connecticut. Also on that date Dr. Carver filled out a certificate concerning David Aureli's death (Plaintiff's Exhibit 2).
Under Part I of the certificate which provides for the cause of death, Dr. Carver wrote under Box 29 that the immediate cause of death was "multiple fractures and internal injuries". Box 30 was left blank. Under Boxes 33 and 37 Dr. Carver wrote that the death was caused by an accident on August 11, 1991 in the A.M., and that the decedent was a driver in a two-vehicle collision on I-84 Exit 25, Waterbury, CT. The certificate was signed on August 11, 1991 and filed with the Registrar of Vital Statistics.
Subsequently, Dr. Carver received the results of the toxicology report concerning David Aureli (Defendant's Exhibit B). This report indicated that Mr. Aureli at the time of his death had a brain alcohol level of .13% and a blood alcohol level of .17%. Thus, on September 6, 1991 Dr. Carver amended the death certificate in the following manner: in Part II, Box 30 which is entitled "Other Significant Conditions: Conditions Contributing to Death but not Related to Cause", Dr. Carver inserted "Acute ethanol intoxication". Plaintiff's Exhibit 4). This amendment was forwarded to the Registrar of Vital Statistics which amended the original death certificate accordingly.
At the request of the family of David Aureli, Dr. Carver was contacted by Attorney Rona C. Lynch. She sought information from him as to why he had amended the death certificate so that it now contained the words "Acute ethanol intoxication" as a "Condition Contributing to Death. . ." In reply Dr. Carver stated. "It is along (sic) standing policy of this office to list acute ethanol intoxication in that portion of the death certificate labeled `Other Significant Conditions' in all motor vehicle drivers who die as the result of injury provided their alcohol level is above 0.1%." (Plaintiff's Exhibit 5). CT Page 2890
The plaintiff, Jeffrey Aureli, brother of David Aureli and Administrator of his estate has brought this declaratory action wherein he requests: 1.) A declaratory judgment that the "long standing policy" of the office of the Chief Medical Examiner is null and void as an enforceable regulation; 2.) The death certificate of David Aureli to be amended by the removal of any and all references to ethanol intoxication, acute or otherwise as a condition contributing to death; and 3.) Any other equitable and/or legal relief deemed appropriate by this court.
A hearing before this court was held on January 14 and 21, 1998. The court finds the following:
At the outset defendants claim that the estate has no interest in this matter, and that the plaintiff has no standing and is not aggrieved. The court disagrees. Under General Statutes Section 52-599 the Administrator has power to bring an action which the decedent could have brought himself Furthermore. in this case the Administrator on behalf of the decedent asserts an "arguably protected interest." Gay Lesbian Law Students Assn.v. Board of Trustees, 236 Conn. 453, 466 (1996), Jeffrey Aureli,Admin. of the Estate of David Aureli v. Dept. of Public Healthet al, CV 96-0556951 (July 8, 1997) (Aurigemma, J.). As stated in Article I, Sec. 10 of the Constitution of the State of Connecticut "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have a remedy by due course of law. . ." (Emphasis added). The Administrator of David Aureli's estate is bringing this action in order to clear the good name and reputation of David Aureli.
The powers and duties of the Chief Medical Examiner are found under the provisions of the Medicolegal Investigations Act General Statutes §§ 19a-401 — 19a-414.
 The Statutes which the court finds pertinent in this matter are as follows:
 § 19a-401 (a) establishes a Commission on Medicolegal Investigations
 § 19a-401 (b) provides that the Commission "shall adopt regulations necessary or appropriate to carry out effectively the provisions" of the Act. CT Page 2891
 § 19a-402 provides that the Commission is within the Department of Public Health for administrative purposes only.
 § 19a-403 provides that the office of Chief Medical Examiner is established to be operated under the control and supervision, of the Commission.
 § 19a-406 provides for the powers and duties of the Chief Medical Examiner.
§ 19a-406 (a) provides:
 "(a) The Chief Medical Examiner shall investigate all human deaths in the following categories: (1) Violent deaths, whether apparently homicidal, suicidal or accidental . . . (2) sudden or unexpected deaths not caused by readily recognizable disease . . . The Chief Medical Examiner may require autopsies in connection with deaths in the preceding categories when it appears warranted for proper investigation and, in the opinion of the Chief Medical Examiner, the Deputy Chief Medical Examiner, an associate medical Examiner or an authorized assistant medical examiner, an autopsy is necessary. The autopsy shall be performed at the Office of the Chief Medical Examiner or by a designated pathologist at a community hospital. Where indicated, the autopsy shall include toxicologic, histologic, microbiologic and serologic examinations . . . The findings of the investigation at the scene of death, the autopsy and any toxicological, histological, serologic and microbiologic examinations and the conclusions drawn therefrom shall be filed in the Office of the Chief Medical Examiner."
§ 19a-407 (a) provides:
 Reports of deaths. Procedure. (a) All law enforcement officers, state's attorneys, prosecuting attorneys, other officials, physicians, funeral directors, embalmers and other persons shall promptly notify the Office of the Chief Medical Examiner of any death coming to their attention CT Page 2892 which is subject to investigation by the Chief Medical Examiner under this chapter, shall assist in making dead bodies and related evidence available to that office for investigations and postmortem examinations, including autopsies, and shall cooperate fully with said office in making the investigations and examinations herein provided for. In conducting such investigations or examinations, the Chief Medical Examiner may issue subpoenas requiring the production of medical reports, records or other documents concerning the death under investigation and compelling the attendance and testimony of any person having pertinent knowledge of such death.
§ 19a-409 provides:
 Issuance of death certificate. The office of the Chief Examiner shall complete its investigation where reasonably possible within thirty days. Upon completion of the investigation, the Chief Medical Examiner, Deputy Chief Medical Examiner, an associate medical examiner, an authorized assistant medical examiner or a pathologist designated by the Chief Medical Examiner shall file a death certificate, or a certificate supplementing that already filed, with the registrar of vital statistics for the town in which the death occurred, if known. . .
§ 19a-411 provides:
 Records. The Office of the Chief Medical Examiner shall keep full and complete records properly indexed, giving the name, if known, of every person whose death is investigated, the place where the body was found, the date, cause and manner of death and containing all other relevant information concerning the death and a copy of the death certificate. The full report and detailed findings of the autopsy and toxicological and other scientific investigation, if any, shall be a part of the record in each case. The office shall promptly notify the state's attorney having jurisdiction of such death and deliver to him copies of all CT Page 2893 pertinent records relating to every death in which further investigation may be advisable. . .
 The pertinent regulations established by the Commission are as follows:
 § 19a-401-4 provides that the Chief Medical Examiner shall have the duty of:
 (a) Investigation of human deaths in accordance with subsections (a) and (c) of § 19a-406
§ 19a-401-12 (a)provides
 "Reports of investigations and of autopsies are prepared on standard forms issued by the Office of the Medical Examiner . . . The Standard forms utilized by the office of the Medical Examiner include: (1) telephone notice of death; (2) report of investigation; (3) hospital report of death; (4) identification form; (5) autopsy report; (6) receipt of evidence.
 (b) Retention of records; inspection of records. The office of the Medical Examiner keeps fill and complete records of every death reported and investigated . . .
The death certificate form is not created by the Chief Medical Examiner's office It comes from the Registrar of Vital Statistics, which is a subsection of the Department of Health Services, "and they create them within custom and federally generated guidelines . . ." (Transcript page 78)
From a reading of the relevant statutes and regulations, it becomes clear that it was the duty of the Chief Medical Examiner to investigate the cause of death of David Aureli, and it was his duty to complete his investigation prior to filling out the death certificate and amended death certificate. The court finds that he failed to conduct any investigation of the underlying facts of the accident prior to amending the death certificate. He amended it based solely on the information contained in the toxicology report. At trial he was questioned about his long-standing policy to list acute ethanol intoxication in that portion of the death certificate labeled "Other Significant Conditions". He stated that if a driver's alcohol level is above 0.1%, it was a long-standing way he always CT Page 2894 did it. (Transcript at page 125). Also at trial he testified that he did not obtain a police report prior to amending the death certificate, nor did he speak with a police officer, nor did he speak with any witnesses or see any of their statements in regard to the accident. The court does not believe that he made a proper investigation of this particular accident prior to amending the death certificate.
It was not until after receiving concerns from the Aureli family about the amended certificate that Dr. Carver re-examined the conclusions which he had inserted on the death certificate. As part of his re-examination he thereupon reviewed the police reports and statements of the witnesses to the accident. He then came to the same conclusion that if Aureli had not had alcohol in his blood, he might have been able to avoid the accident. Thus, in his opinion, Aureli himself contributed to the accident. He testified after his subsequent investigation, that because Aureli's body contained .13 and .17 alcohol, that fact contributed to the accident. (Transcript page 51). He stated that it contributed to the accident because the use of alcohol couldhave gotten him in the situation where he was killed. (Transcript page 71). When asked whether the multiple fractures and internal injuries that killed David Aureli were at least in part the result of his ingestion of alcohol he stated: "It is my opinion that his ingestion of alcohol was a significant condition contributing to that occurrence. (Transcript page 119). When asked the following question: "And in this case, in the case of David Aureli, you believe that ethanol intoxication did result in the blunt trauma, multiple fractures, don't you." He responded, "contributed to." (Transcript page 119).
The court has studied the entire file which includes the police report and statements of witnesses. It finds Dr. Carver's conclusions to be speculative at best. The court could find no evidence that Aureli's so-called condition contributed to the accident. Dr. Carver's conclusion that "acute ethanol intoxication" contributed to the accident has thus injured the good reputation of David Aureli. All the court could tell from a study of the file was the following: That Aureli was driving behind two cars in the left-hand lane going east on I-84; that a car being driven westbound by Glen Caisse was traveling in the same lane in the that there was a slight up-grade at the accident scene; that William Martinez was two cars ahead of Aureli and was driving 55 miles per hour in the left lane; that Martinez observed a car coming at him in the wrong direction and that it CT Page 2895 appeared to be traveling faster than 55 miles per hour; and that Martinez had enough room and time to drive to the center lane in order to avoid the collision. Another witness, Michael Soule, was driving directly behind Martinez and in front of Aureli. He stated that he was driving east bound on I-84 between 55 and 65 miles per hour in the left lane; he observed two sets of tail lights up ahead of him drive suddenly to the right shoulder; he then observed a set of headlights driving towards him at a high rate of speed; and that as this vehicle approached him "he (Soule) had just enough time to drive to the right lane." Michael Gillis, a passenger in Soule's car stated that he first noticed a vehicle traveling toward them about one-quarter of a mile away from their location. He stated that Michael Soule "had justenough time to drive to the right lane to avoid a head-on collision."
The court finds that Dr. Carver's conclusion that David Aureli might have been able to avoid the accident if he hadn't had a .13 alcohol count in his blood is a mere assumption and based on nothing but speculation. The court finds his decision in this case to be arbitrary and an abuse of his discretion. There is no way of telling, if one were not at the scene, whether anyone in Aureli's position on the highway could have been able to avoid the accident (whether he had alcohol in his blood or not), especially in light of the fact that his car was third in line. While the first car in line was able to avoid the accident, the second car in line had just enough time to avoid the accident. Had Aureli been the first in line and William Martinez third in line, it could very well be that Aureli would have avoided the accident whereas Martinez could not have avoided the accident.
In short, the court finds that there does not to appear any evidence to indicate that Aureli's so-called condition in any way contributed to the accident. The court is therefore compelled to reverse Dr. Carver's decision.
Accordingly, Dr. Carver is ordered to amend David Aureli's death certificate by the removal of any reference to acute ethanol intoxication as a condition contributing to death.
ALLEN, S.T.R. CT Page 2896